David F. Dobie, Individually and as Executor of Thomas Armstrong, Deceased, et al., Respondents, *v.* Emmett Armstrong, Appellant, Impleaded with Another.

1. Will — Action to Determine Validity of Probate — Burden of Proof. In an action under section 2653a of the Code of Civil Procedure, to determine the validity of the probate of a will, the burden of establishing the testamentary incapacity of the testator, over the *prima facie* evidence of the validity of the will afforded by its probate, rests upon the party contestant.

2. Unequal Testamentary Disposition. A testamentary disposition of property is not invalidated because its provisions are unequal or unjust, or the result of passion, or of other unworthy or unjustifiable sentiments.

3. Absence of Provision for Child. No obligation to make testamentary provision for a child is imposed upon the parent, and the presumption of validity of a will is not affected by the failure to do so, alone.

4. Advanced Age of Testator. The presumption in favor of a will is not overcome by showing that the testator was of advanced age, or of enfeebled condition of mind or body.

5. Unjustfiable Impression not Delusion. That the testator may have received some unjustifiable impression, which had actuated him in making his will, does not warrant calling it a delusion.

6. Submission to Jury of Question of Mental Capacity. In an action under the statute (Code Civ. Pro. § 2653a) to determine the validity of the probate of a will, the trial court is not required to submit the question of the testator's mental capacity to the jury, merely because some evidence has been introduced by the party bearing the burden of proof.

7. Submission to Jury not Always Compulsory. The legislature did not intend, and the statute does not compel the construction, that every case brought under section 2653a of the Code must be submitted to the arbitrament of a jury.

8. Evidence Requisite to Submission to Jury. An action under section 2653a of the Code, involving the question of testamentary capacity, does not call for submission to the jury unless the evidence is such as would warrant the court, in its review of the facts, in holding that it actually tended to prove such mental unsoundness in the testator, when proceeding to make a testamentary disposition of his property, as, by reason of the existence of some delusion, to render him incapable of forming a judgment as to the condition of his property, or of apprehending his true relations to the person whom his will deprives of the share in the estate which was reasonably or naturally to have been anticipated.

9. Case Warranting Direction of Verdict Sustaining Will. When, in an action brought by the executors to establish the validity of

the probate of a will giving the bulk of the testator's property to a college and making no provision for his only child and son, the burden is upon the son to adduce evidence which would be sufficient to uphold a verdict that the testator was the victim of such a delusion with respect to his son as to prevent his affections from operating in their natural channel, a verdict sustaining the will is properly directed by the court, where the evidence does not show or tend to prove that the testator was insane when he executed the will, and fails to prove that he was influenced by .any insane delusion, in his domestic relations, but the proof is abundant that they were sufficiently unfortunate and unhappy, whether attributable to his behavior or not, to embitter him and to harden his affections against his son, who had disappointed his ambition and who, turning against him in his latter years, had passed out of the sphere of his life.

*Dobie* v. *Armstrong*, 27 App. Div. 520, affirmed.

(Argued October 13, 1899; decided November 21, 1899.)

APPEAL from a judgment of the Appellate Division of the. Supreme Court in the fourth judicial department, entered June 7, 1898, affirming a judgment entered in Clinton county in favor of plaintiffs, upon a verdict directed by the court.

The appeal below was transferred from the third. to the fourth department by reason of the disqualification of two justices of the third department.

The nature of the action and the facts, so far as material, are stated in the opinion.

*T. F. Conway* for appellant. The evidence in the case shows that the testator was of unsound mind, suffering from delusions in regard to his son, his family and property, and incompetent to make a will at the times the wills and codicil in question were executed or at least entitled defendant to have the question of his competency submitted to the jury. (*S. F. Society* v. *Hopper*, 33 N. Y. 619; *Delafield* v. *Parish*, 25 N. Y. 24.) Defendant's exceptions to the direction of a verdict by the court require a reversal of the judgment under well-settled authority. (*S. F. Society* v. *Hopper*, 33 N. Y. 619; *Clark* v. *Fisher*, 1 Paige, 171; *Riggs* v. *A. T. Society*, 95 N. Y. 503; *Merrill* v. *Ralston*, 5 Redf. 220; *Delafield* v. *Parish*, 25 N. Y. 9; *Stewart* v. *Lispenard*, 26 Wend. 255; *Blanchard* v. *Nestle*, 3 Den. 37; *Matter*

*of Gannon,* 51 N. Y. S. R. 415; *Matter of Bull,* 20 N. Y. S. R. 522; *Matter of Budlong,* 126 N. Y. 423.) The trial court was not at liberty to disregard the opinion of the experts. who testified that the testator was incompetent and of unsound mind. It is well established that such evidence, when based upon the observation of the witnesses or upon facts testified to upon trial, always raises a question of fact if conflicting upon the issue. (*Brehm* v. *G. W. Ry. Co.,* 34 Barb. 273; *De Witt* v. *Barly,* 17 N. Y. 348; *Templeton* v. *People,* 3 Hun, 357; *Leitch* v. *A. M. Ins. Co.,* 66 N. Y. 108; *Cornish* v. *F. B. F. Ins. Co.,* 74 N. Y. 298; *Spring Co.* v. *Edgar,* 99 U. S. 658; Code Civ. Pro. § 2586; *Marvin* v. *Marvin,* 4 Keyes, 9; *Webster* v. *Cole,* 17 Hun, 507; *Matter of Beck,* 6 App. Div. 211; *Matter of Ross,* 87 N. Y. 514; *Matter of White,* 121 N. Y. 406.)

*Richard L. Hand, Royal Corbin* and *L. L. Shedden* for respondents. Thomas Armstrong, the testator, was of sound and disposing mind at every period of his life. (*People* v. *Kemmler,* 119 N. Y. 583; *People* v. *Augsbury,* 97 N. Y. 504.) There was no evidence in this case sufficient to take it to the jury. It would have plainly been the duty of the court to set aside the verdict, if rendered against the validity of this will. (Code Civ. Pro. § 2653a; *Hawke* v. *Hawke,* 82 Hun, 439; 146 N. Y. 366; *Matter of Kiedaish,* 13 N. Y. Supp. 255; Buswell on Insanity, 383; *Matter of Forman,* 54 Barb. 274; *Matter of Jones,* 5 Misc. Rep. 199; *Matter of Suydam,* 84 Hun, 514; *Delafield* v. *Parish,* 25 N. Y. 9; *Van Guysling* v. *Van Kuren,* 35 N. Y. 70; *Matter of Snelling,* 78 Hun, 211; *Matter of Skaats,* 74 Hun, 462; *Matter of White,* 121 N. Y. 406.) The court properly directed a verdict for the plaintiffs at the close of the trial. (*Hawke* v. *Hawke,* 82 Hun, 439; 146 N. Y. 366; *Hudson* v. *R., W. & O. R. R. Co.,* 145 N. Y. 408; *Katz* v. *Schnaier,* 87 Hun, 343; Code Civ. Pro. § 2653a; *Jackson* v. *King,* 4 Cow. 207; *Dwight* v. *G. L. Ins. Co.,* 103 N. Y. 341; *Linkhauf* v. *Lombard,* 137 N. Y. 417.)

GRAY, J.   The plaintiffs, who are executors of, and, also, legatees and devisees under, the will of Thomas Armstrong, deceased, brought this action to establish the validity of the testamentary probate.   The testator died in December, 1895, and his will was probated in the Surrogate's Court of Clinton county, in May, 1896.   In the present action Emmett Armstrong, the only child and son of the deceased, and Harriet Armstrong, a divorced wife, were made defendants.   The latter disclaimed all interest in the testator's personal estate and, upon the trial, the judgment divorcing her from the deceased was conceded to be valid.   The son, to whom the will gave nothing, contested its validity, upon the ground that his father was of unsound mind and incompetent to make a will.   At the conclusion of the trial, the court directed the jury to find a verdict in favor of the plaintiffs and a judgment was entered thereupon, establishing the validity of the will. The Appellate Division has affirmed the judgment and an appeal has been taken to this court.

It is insisted upon by the appellant that the evidence was sufficient to raise a question of fact, as to the testamentary capacity of the testator, which should have been submitted to the jury.   His contention is that the evidence proved, or strongly tended to prove, that the testator was influenced in making his will by a mental delusion with respect to his son's character, conduct and habits.

I think it unnecessary to indulge in any extended discussion of the facts of this case; inasmuch as they were quite fully reviewed, first, by the learned trial judge upon his direction of the verdict and, again, at the Appellate Division.

Thomas Armstrong was seventy-six years of age at the time of his death.   He came to this country a poor and friendless boy, and commenced to work at his trade of a tailor.   In 1842 he married his first wife, the defendant Harriet, and soon commenced the study of the law.   In 1847, he took up his residence in Clinton county, in this state; became a member of the bar and attained a position of eminence thereat and, generally, in the community.   At one time, he was district

attorney for his county and, during the war of the rebellion, he had served as the colonel of a volunteer regiment. In the course of his life, he accumulated an estate of some $250,000 and, alone, managed his business affairs until his death.

Emmett Armstrong, the testator's son, was born in 1848 and was educated, in part, at Union College, in this state, and, in part, in Europe. He was permitted to travel considerably in Europe by his father; who seems to have had much affection for him and to have exhibited some pride in his attainments. Early in life, he appears to have contracted habits of intemperance and was inclined to be improvident and lax in money matters.

In 1882, the testator and his wife ceased to live together and considerable litigation ensued between them. She was seeking to obtain an absolute divorce here and he obtained such a judgment in the Dakota courts, in 1883, by default. As the final outcome of negotiations, an agreement was entered into between them, to the effect that the default obtained by him should be opened; that she should appear in the action and that, in case a judgment of divorce should be finally rendered in his favor, it should provide for the payment to her of the sum of $15,000, as alimony and in lieu of dower. Such a judgment was entered and, thereafter, Mrs. Armstrong removed to Pennsylvania; where she invested the moneys received by her and supported herself and their son, Emmett, who had accompanied her.

In 1889, the testator married another woman; with whom, it may be inferred from the evidence, he had previously become infatuated. In 1890, he conveyed by deed certain real estate to Union College; the income of which, amounting to about $6,650, was to be applied towards maintaining professorships and the support of students, who should be farmers' sons from Clinton county. In 1891, a second deed of the same property to the college was executed, jointly, by the testator and his wife; which recited the obligation of the college to pay the sum of $1,000, a year to her during her life. In 1893, the testator made a holographic will, which, after some small

bequests, gave the residue of his estate to Union College for the purpose of establishing certain annual prizes and certain scholarships for the sons of farmers of Clinton county. Judge Landon, a justice of the Supreme Court of the state and a trustee of the college, and Dr. Webster, then president of the college, were made residuary legatees as to all property not legally disposed of. Afterwards, the testator executed a codicil, whereby he gave to his wife an annual income of $1,000 ; which, with the provision in the college deed, would assure her an annual income of $2,000. In May, 1895, he executed a second holographic will, which gave the remainder of his estate to the college for the same objects as previously expressed, and provided, as in the former will, that, as to any part of his estate not legally devised, it should go to Judge Landon and to Dr. Raymond, then the president of the college in succession to Dr. Webster. These were the three testamentary papers which were admitted to probate.

With respect to the disposition of his estate in favor of Union College, it may be observed that the interviews and correspondence had between Armstrong and Judge Landon show the formation and development of such a purpose for several years prior to the former's death.

In the evidence furnished by the testimony of persons, who had known the deceased and had had intercourse, in business and other ways, with him, and by the latter's letters and documents, we have indisputable proof that, in the conduct of his life, the testator had been a man of extraordinary intellectual vigor and ability. His characteristics were those of a self-willed, proud and passionate man ; who certainly made little, if any, effort to govern his impulses, or to exert any control over a very bad temper ; who frequently engaged in bitterness of speech, or in making defamatory statements, and who was cruel and, at times, even brutal in his conduct. He was most eccentric in his habits, and in entertaining singular and, often, extravagant theories. He was highly sensitive and susceptible to offense, and his pride, or vanity, was such as, probably, to prevent him from making advances. For several

years, prior to his death, his health was affected by a disease of the kidneys; but though, at times, greatly prostrated by its attacks, he seemed to have had remarkable powers of recuperation. His emotions were easily excited and he would be effusive in his demonstrations of affection, or of grief.

The appellant has brought together a multitude of instances, exhibiting these various and peculiar characteristic traits of the deceased, and he claims to have shown that his mind was unbalanced and incapable of that soundness of judgment, which the testamentary disposition of his property required.

Ordinarily, the burden of proof is upon the party propounding a will; but section 2653a of the Code of Civil Procedure, which is the authority for the maintenance of this action, places the burden upon the defendants, who contest the validity of the will, of establishing the testamentary incapacity of the testator. The probate of the will by the surrogate is made *prima facie* evidence of its due execution and validity. The affirmative was with this appellant upon the question of the case: whether a delusion, or an insane belief, existed in the testator's mind with respect to his domestic relations, and, especially, with respect to his son, which incapacitated him from validly willing away his estate. The burden was upon him to adduce evidence, which would be sufficient to uphold a verdict that the testator was the victim of such a delusion with respect to his son, as to prevent his affections from operating in their natural channel. He assumed the burden of showing that there was no cause for his father's changed feelings, in facts, or in actual circumstances, and, therefore, that they could only have had their origin in some figment of the brain.

Up to 1881, the testator and his wife lived together, as husband and wife, although their relations had become strained. The son was then thirty-three years of age. He had disappointed his father, by his refusal to engage in business. From his wife's letters, from reports, and from observation, the testator believed that his son was intemperate and gambled.

These ideas were not enough, however, to turn him against his son and would not, necessarily, have done so, had not the events from 1881 to 1886 supervened.  During those years, when litigation existed between him and his wife, his feelings of dislike for the latter were accentuated by mortification at the charges made by her against him; and his affection for his son was destroyed, from various causes.  His son had espoused his mother's side, and among the many things, in addition to that, which might be alluded to as contributing towards the destruction of his affection, were, possibly more prominently, these ; that he consulted upon his mother's matters with Mr. Smith M. Weed, a lawyer, who was conspicuous in public life, a political antagonist of his father and for whom the deceased entertained hostile feelings ; that he wrote a letter to an uncle, in which, after much abuse of his father, he spoke of him as being fit to be sent to the penitentiary, and that, from 1881 to the time of his father's death in 1895, a period of fourteen years, there were absolute silence and an estrangement on his part.

Stress is laid upon the fact that the testator was known to have called his son a bastard, without any reason; but that, evidently, was not his belief.  He, undoubtedly, said so in anger and excitement and when he wrote to his wife, in 1882.  That letter, however, was after his wife had charged him with adultery and, quite possibly, was a counter attack on his part, to deter her from prosecuting the charges.   If it was true that he believed his son to be a bastard, he could not have written to him with such affection and consideration, as he certainly had often done.

It is plain that the will, in its provisions, was not the result of any sudden impulse; but, rather, of a definite purpose formed in prior years and while the estrangement existed between him and his son.  The experts, who testified in the case for the contestant, seemed, practically, forced to concede that, without the assumption of the existence in the testator's mind of a delusion as to his son, he could not be regarded as mentally unsound at the time of making his will.   The hypo-

thetical question, which was answered by the experts for the contestant in favor of his contention, that the testator was mentally unsound, resumed a quantity of isolated facts and expressions during a great number of years. When brought together in this question, they are made to present that appearance of continuity, with respect to the testator's state of mind, which makes the question unfair, as describing the self-made and successful man · with whom we are made acquainted through the evidence. The assumption in the hypothetical question of the existence of an insane impulse with regard to his son, from his having characterized him as a drunkard and as an otherwise worthless character, was not warranted by the evidence. There was not an absence of facts, or of circumstances, for the formation of such impressions by the deceased.

Apparently, at times, entertaining irrational opinions and views of men and of affairs; eccentric and arbitrary in conduct, the evidence, as a whole, shows that the testator was quite capable of personally managing his various interests and that he could not be regarded as insane, however different he might be from other men.

It seems to me that this was not a case, which should have been submitted to the decision of the jury. The contestant had not met the burden cast upon him by the statute of impeaching the validity of the testamentary act. The evidence does not prove, or even tend to prove, that the testator was insane when he executed the testamentary instruments in question. It fails to prove that he was influenced by any insane delusion, in his domestic relations. The proof is abundant that they were sufficiently unfortunate and unhappy, whether attributable to his behavior or not, to embitter him and, with his peculiar temperament, to harden his affections against the son, who had disappointed his ambitions and who, turning against him in his latter years, had passed out of the sphere of his life.

When we consider what was the intellectual strength of his mind and his self-sufficiency, as shown through his long life,

and the reasons, good or bad, which undoubtedly existed for his making the disposition of his property complained of, it is impossible to say that there was any substantial foundation in the proofs for a judgment that the testator's mind was so diseased as to incapacitate him from making this will. A man's testamentary disposition of his property is not invalidated, because its provisions are unequal, or unjust, or the result of passion, or of other unworthy or unjustifiable sentiments. It is natural and, therefore, usual to make provision for a child; but, under our governmental institutions, no obligation to do so is imposed upon the parent and the presumption of validity is not affected by the failure to do so, alone. Nor is the presumption in favor of a will overcome by showing that the testator was of advanced age, or of enfeebled condition of mind or body. (*Horn* v. *Pullman,* 72 N. Y. 269.) That the testator may have received some unjustifiable impression, which had actuated him in making his will, does not warrant us in calling it a delusion. A man may even have an insane delusion and yet be able to make a valid will; for the will to be invalid must be the result itself of the delusion, and it is not a delusion which incapacitates, if the proof of its existence depends upon external and observable facts, giving rise to impressions which, upon investigation, might be proved to be unjust. In *The Matter of White's Will* (121 N. Y. 406), where it was the proposition of the contestants that, when the will was made, the testator was laboring under the insane delusion that his son was engaged in a conspiracy to injure and to defraud him and that the will was the offspring of such a delusion and, therefore, invalid, it was observed that "delusion is insanity, where one persistently believes supposed facts, which have no real existence, except in his perverted imagination, and against all evidence and probability, and conducts himself, however, logically, upon the assumption of their existence. * * * But, if there are facts, however insufficient they may in reality be, from which a prejudiced, or a narrow, or a bigoted mind might derive a particular idea, or belief, it cannot be said that the mind is diseased in that

respect.  The belief may be illogical, or preposterous, but it is not, therefore, evidence of insanity in the person."

I cannot bring my mind to the conclusion that the evidence was sufficient, in this case, to warrant its submission to the jury.  Whether it was sufficient was a question of law for the court and the trial judge, in holding as he did, in my opinion, committed no error.  The trial court was not required to submit the question of the testator's mental capacity to the jury, merely because some evidence had been introduced by the party bearing the burden of proof.  (*Dwight* v. *Germania Life Ins. Co.*, 103 N. Y. 341; *Linkhauf* v. *Lombard*, 137 *ib.* 417–425.)  The legislature never could have intended, and the statute does not compel the construction, that courts should hold that every case, which is brought under section 2653a of the Code, must be submitted to the arbitrament of a jury.  Experience has shown that verdicts are frequently unduly influenced by considerations based upon sentiment and sympathy, and no wise policy demands that, in cases of such importance and of such far-reaching consequences, the jury should determine the controversy upon any showing of the contestants.  Their verdict should proceed upon such evidence as would warrant the court, in its review of the facts, in holding that it actually tended to prove such mental unsoundness in the testator, when proceeding to make a testamentary disposition of his property, as, by reason of the existence of some delusion, to render him incapable of forming a judgment as to the condition of his property; or of apprehending his true relations to the person, whom his will deprives of the share in the estate, which was reasonably, or naturally, to have been anticipated.

Such cases are fraught with the gravest consequences and I do not believe that a solemn testamentary disposition of property should be left to the decision of a jury upon mere surmise, or upon inferences from facts, which are as consistent with the one view as with the other.

I think that the evidence produced. by the contestant was not of a nature that the jury could have properly proceeded

to find a verdict upon it in his behalf and, further, that, if such a verdict had been rendered, it could not have stood the test of a motion addressed to the court to set it aside.

I advise the affirmance of this judgment.

All concur, except Parker, Ch. J., not sitting.

Judgment affirmed.