(54 Misc. Rep. 474.)

### SHAYNE et al. v. SHAYNE et al.

(Supreme Court, Trial Term, New York County. May, 1907.)

1. WILLS—PROBATE—SETTING ASIDE.

The probate of a will, will be set aside only where there is substantial proof of mental incapacity of the testator, or the exercise of undue influence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 916.]

2. SAME—EVIDENCE.

In an action under Code Civ. Proc. § 2653a, to set aside a decree of the probate, plaintiff must overcome the prima facie presumption of due execution and validity of the codicil by a preponderance of evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 916.]

3. SAME—COMPETENCY OF TESTATOR—QUESTION FOR JURY.

In proceedings to set aside the probate of a codicil the question as to whether testator was of sound mind will not be submitted to the jury, unless the evidence tends to show that he did not have sufficient mental capacity to comprehend the condition of his property—to remember his relations, and to understand the scope of the codicil.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 768.]

Action by Mary Shayne and others against Margaret A. Shayne and others. Motion by defendant for direction of verdict granted.

Olcott, Gruber, Bonynge & McManus (William M. K. Olcott and Clarence E. Lexow, of counsel), for plaintiffs.

Joseph N. Tuttle (Charles O. Maas, of counsel), for executors of Christopher Shayne, Edward Nolan, John T. Shayne, Raymond Greenless, Clifford Greenless, and Percy Greenless.

Cleveland & Cleveland (Charles D. Cleveland, of counsel), for guardian ad litem of Christopher C. Shayne, Nellie Shayne, and Margaret Shayne.

BRUCE, J. The evidence shows that the codicil, to determine the validity of which this action is brought, has been admitted to probate by the Surrogate's Court of this county. In this action, therefore, which is brought under section 2653a of the Code of Civil Procedure, the codicil and the decree constitute prima facie evidence of its due attestation, execution, and validity, and cast upon the plaintiffs the burden of overcoming this presumption by a preponderance of evidence. They are bounden, under the issues raised by the pleadings, to establish against this presumption the fact either, first, that this codicil was not executed and attested in accordance with the requirements of law; or, second, that, at the time this codicil was executed, the testator was under the undue influence of his wife, the defendant Margaret A. Shayne, and that, therefore, the codicil does not express the testator's free will and desire; and third, that at the time the testator executed the codicil he was of unsound mind.

No evidence has been given tending to support the first proposition. The proof conclusively shows that all the requirements of law were fully complied with. Nor is there any evidence tending to support the second proposition. Undue influence must be established by facts and circumstances. Opportunity is not enough. In Children's Aid Society v. Loveridge, 70 N. Y. 394, the court said that, to warrant the submission of this question to the jury, there must be evidence tending to show that influence was exercised upon the testator which amounted to a moral coercion and which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, and which he was unable to refuse or too weak to resist. It must not be the promptings of affection, the desire of gratifying the wishes of another, or the ties of attachment arising from consanguinity; but a coercion, produced by importunity, or by a silent resistless power which the strong will often exercises over the weak, and which could not be resisted, so that the motive was tantamount to force or fear. Gratitude, love, esteem, or friendship which induces another to make testamentary disposition of property cannot ordinarily be considered as arising from undue influence; and all these motives are allowed to have full scope, without in any way affecting the validity of the act. So also lawful influences, which arise from claims of kindred and family or other intimate personal relations, are proper subjects for consideration in the disposition of estates, and, if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation. There is an absolute failure here of any proof tending to establish undue influence.

There remains, therefore, only the question: Was the testator of sound mind at the time he executed this codicil? To justify the submission of this question to this jury against the presumption raised by the decree of the surrogate, there must be evidence tending to show that he did not then have sufficient mental capacity to comprehend perfectly the condition of his property, his relation to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of this codicil; that he did not then have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other and be able to form some rational judgment in relation to them. The evidence shows that the testator at the time of the execution of this codicil was a prominent business man in this city; that he died on the 21st day of February, 1906, without issue, or the descendants of any issue, and left surviving a wife to whom he had been married for over 30 years, an aged mother who was dependent upon his bounty, two brothers, and several nieces and nephews. His estate amounted to about $275,000 and was largely invested in a fur business in this city, which he had established many years previous. He owned also, among other property, several farms in Galway, his native town, including the old homestead on which his aged mother lived. On May 23, 1905, he made a will, leaving the old homestead to his aged mother during her life, with remainder in fee over to his niece, and leaving to his mother also during her life the income of $25,000. The remainder of his estate he left to his wife, to have and to enjoy the income thereof during her life, with provision that, upon her death, the estate including these farms should pass to his brother and to various nephews and nieces. On the 23d of January, 1906, he executed the codicil in issue, by which he gave his entire estate to his wife, expressing therein the wish that she would carry out the provisions of the will of May 23, 1905, although imposing no legal obligation upon her to do so. The evidence shows that he became ill in the spring of 1905, and that, in May of that year, he made a trip to Europe for his health on the advice of his physician, accompanied by his wife, returning about the middle of July. The remainder of the summer he spent in his summer home in Galway, returning to New York in the fall. In January, 1906, two days after the execution of the codicil, he started on his trip through the South, intending to go as far as California, for his health, taking this trip upon the advice of his physician. He stopped en route at Washington, Atlanta, New Orleans, and several other cities and finally reached San Antonio, Tex., where he became worse, and started to return to his home. He stopped at Atlanta, Ga., on his way back, and died there on February 21, 1906. The physician who attended him during the last three days of his illness testified that death was due to fatty degeneration of the heart, coupled with chronic Bright's disease. This physician had never before seen the testator. He testified that this examination, made a few days prior to his death, to wit, on the 19th day of February, 1906, revealed that the Bright's disease was of a chronic nature and that, in his judgment, it must have existed for at least six months. It is conceded

that the testator, when he made his will on the 23d day of May, 1905, had full testamentary capacity, and that the provisions of this will expressed the intention which the testator then had in relation to the disposition of his property.

The plaintiffs have offered a great mass of evidence, tending to show, among other facts, that the health of the testator suffered a decline from the spring of 1905 until his death; that he was very much troubled and worried during the fall of that year because certain mechanics' liens had been placed on a new store which he was then erecting; that he was irritable and excitable; that he had occasional lapses of memory with respect to some small matters; that on occasions he would pass quickly in conversation from one subject to another; that he had lost flesh rapidly, became physically weak, and continued to decline until the time of his death. The physician who attended him during the last three days of his life testified that the chronic Bright's disease from which he was then suffering was, in his opinion, of at least six months' standing, and that it was a sufficient producing cause of these mental and physical conditions. No direct evidence has been offered by the plaintiffs with reference to the testator's mental condition at the time he executed the codicil; and, in order to support the allegations of mental unsoundness, we are dependent entirely upon such inferences and presumptions as may properly be drawn from the condition of the testator prior and subsequent to the time of such execution. There is evidence tending to show that the testator was naturally somewhat eccentric, pompous, egotistical, quick-tempered, and that, during the last months of his life, his natural peculiarities were greatly aggravated and accentuated by the diseases from which he was suffering. But this is not sufficient to establish that, at the time of the execution of the document, the testator did not have sufficient capacity to comprehend perfectly the condition of his property, and his relation to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of the instrument. Wills are not to be set aside except for the gravest reasons. It is only in a case where there is substantial proof tending to establish mental incapacity or undue influence that courts or juries may annul testamentary acts. To warrant the submission to the jury of the testator's mental capacity at the time he executed the codicil in question, there must be evidence which would warrant the court in its review in holding that it naturally tended to prove such mental unsoundness in the testator, when he executed this codicil, as to render him incapable of forming a judgment as to the condition of his property or of apprehending his true relations to the persons whom his will deprives of a share in the estate which might reasonably or naturally have been anticipated.

I have not overlooked the evidence given by Dr. Hubbard that, in his opinion, the testator did not have testamentary capacity at the time this codicil was executed. The fact is that he never saw the testator until a few days prior to his death, when he was practically in extremis. But he testified that, even during those days, the testator may have had lucid intervals. His opinion as to the testator's soundness of mind on January 23, 1906, was based almost entirely upon facts of

which he had no personal knowledge, and was therefore largely speculative. It must be borne in mind that we are not here to determine whether or not the testator made a wise or just disposition of his property, or whether he should have made provision for his aged mother or others of his next of kin. A person has a right to dispose of his property in such a way and to such persons as he thinks best. He may disinherit child and parent. I have considered carefully, day by day, the evidence, as it has been offered upon this trial, and have weighed the arguments of counsel made upon this motion. I have also read carefully not only the opinion of the Court of Appeals in Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302, and also in Hagan v. Sone, 174 N. Y. 317, 66 N. E. 973, but have also examined the record which was before the court upon those appeals; and, in the light of these decisions, and of the later decision in Philips v. Philips, 77 App. Div. 113, 78 N. Y. Supp. 1001, affirmed 179 N. Y. 585, 72 N. E. 1149, I cannot bring my mind to the conclusion that the evidence in this case is sufficient to warrant its submission to the jury. I do not deem it necessary, in passing upon this motion, to review the great mass of evidence, both oral and documentary, submitted by the defendants, to show that at the time the testator executed this codicil he was of sound mind; that, during the months of September, October, November, and December, 1905, and January, 1906, up to the time of his departure for the South, he was, as usual, in personal charge of his extensive business and gave personal attention to the management of his affairs; that during the day, the evening of which he executed the codicil, he was at his usual place of business, signing checks, conversing with his cashier and manager, negotiating with his bank for loans of thousands of dollars, and transacting business of the most serious and important character with his usual mental vigor; that he stated to Mr. Smith, his confidential man, during luncheon on that day, that he was going to execute his will that evening, and that during the afternoon he showed the codicil to a friend, while riding in the park, and stated to him its contents, and remarked upon the reasons why he was leaving his entire property to his wife; that on that day he drew a check for $100 and sent it to his mother, showing that he had her fully in mind; that he himself invited the subscribing witnesses to his home to act in that capacity; that he signed the codicil in their presence, and asked each of the gentlemen who were witnesses to read it aloud before they signed as subscribing witnesses; that on the following day he was busy making final preparations for his trip; that on his way south he visited Washington, Charlotte, Atlanta, Montgomery, New Orleans, and San Antonio; that he was deeply interested and seemed to thoroughly enjoy all that came under his observation, and that he occasionally wrote letters to his business associates here in New York.

I am therefore led irresistibly to the conclusion that the court has but one duty to perform, and that is to direct the jury to find a verdict that the codicil executed by Christopher C. Shayne, on the 23d day of January, 1906, in his last will and testament; and I so direct.